IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 19-00113 JAO |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| vs. | ) | |
| | ) | |
| JOHN MCAVAY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On January 30, 2020, the Grand Jury returned a Superseding Indictment against Defendant John McAvay ("Defendant" or "Defendant McAvay"), charging him with two counts:  Count 1 — Involuntary Manslaughter, a violation of 18 U.S.C. §§ 7(8) and 1112; and Count 2 — Assault Resulting in Serious Bodily Injury, a violation of 18 U.S.C. §§ 7(8) and 113(a)(6).  ECF No. 27.  Defendant waived his right to a jury trial, ECF No. 155, the Government consented, ECF No. 156, and the Court approved, *id.  See* Fed. R. Crim. P. 23(a).  A five-day bench trial commenced on May 5, 2022.  ECF Nos. 191–93, 197, 200–01.  In advance of the trial, the parties submitted proposed findings of fact and conclusions of law and, after their oral closing arguments, the parties submitted written closing

arguments.  ECF Nos. 189, 190, 212, 213.  The Government also submitted revised proposed findings of fact and conclusions of law.  ECF No. 214.

After examining the record, including the admissible testimony and exhibits, and after considering the parties' oral and written arguments, the Court finds Defendant McAvay NOT GUILTY of Count 1 — Involuntary Manslaughter and GUILTY of Count 2 — Assault Resulting in Serious Bodily Injury, and enters the following findings of fact and conclusions of law.

The Court starts with a few observations.  This was not an easy decision.  Even putting emotions aside — which the Court understands it has the luxury to attempt to do — there is no doubt that Michael O'Connor did not deserve to suffer and die the way he did.  There is no doubt that his family does not deserve to suffer the way they continue to do.  There is also no doubt that Defendant McAvay acted cowardly, reprehensibly, and despicably.

As explained below, the Court did not struggle with any question related to Defendant McAvay's behavior.  Instead, the most difficult question was a scientific and legal one, related to what caused the pulmonary embolism that caused Mr. O'Connor's death.

## FINDINGS OF FACT

1.    Unless otherwise indicated, the Court found the witnesses at trial to be

credible based on their demeanor, the reasonableness and consistency of

their answers, and, in the case of expert witnesses, their training and experience.

2.     As reiterated below, the crimes charged in this matter occurred within the special maritime and territorial jurisdiction of the United States.  ECF No. 194.

### The Cruise And Its Passengers

3.     On October 20, 2018, the Star Princess cruise ship (the "Ship"), a foreign flagged vessel, departed from the Port of Los Angeles for a two-week tour to Hawai'i.  ECF No. 198 ("Tr. 1") at 110; ECF No. 210 ("Tr. 4") at 57; ECF No. 194.  The Ship had over 2,500 passengers, along with ship security, crew members, and medical personnel on board.  ECF No. 206 ("Tr. 2-2") at 6.

4.     United States citizen Michael O'Connor and his wife Viola O'Connor were passengers on the Ship.  At the time, Mr. O'Connor was seventy-three years old.  He and his wife had extensive experience on cruises and spent much of their time on ships as they did on land — as active individuals who enjoyed exercising and dancing.  Tr. 1 at 106–11; Exhibit 3; Exhibit 92 at 1; ECF No. 194.

5.     Although he was active, Mr. O'Connor did have some medical conditions worth noting.  Most significantly, sometime in 2017, Mr. O'Connor had a

scalp melanoma (skin cancer) removed. Tr. 1 at 145. But prior to the cruise, his doctor had not detected that the melanoma was metastatic (that it had spread). *Id.* at 146.

6. Defendant was seventy-four years old and also a passenger on the ship, along with his wife. Defendant is a former law enforcement officer and United States citizen. Exhibit 83 at 1, 4, 10, 17; ECF No. 194.

### *The Incident In The Bathroom*

7. On October 23, 2018, Mr. O'Connor and his wife were enjoying the cruise and nothing appeared out of the ordinary regarding Mr. O'Connor's mental or physical health. Tr. 1 at 116.

8. That evening, the O'Connors danced in one of the Ship's lounges and decided to go to a different bar to dance to another band. *Id.* The band at the bar had not started to play, so the two decided to take bathroom breaks. *Id.* at 116–17. Neither had consumed any alcohol that evening. *Id.* at 117.

9. Mr. O'Connor went to a nearby men's restroom. At least three other cruise ship passengers were also present in the men's bathroom: (1) Defendant, (2) Franklin Brunsmann, and (3) Allen Fidler. Tr. 1 at 28, 117, 162.

10. The men's bathroom contained two closed stalls on the right (with two sinks situated directly across on the left), and three urinals in the back.



Exhibit 29.



Exhibit 38.

11.    The two closed stalls were unusual in that the doors were from the floor to

the ceiling.  Exhibit 44.  The entrance/exit door was nearly identical to the

stall doors and floor to ceiling.  Exhibit 46.

12.     The following picture depicts how the bathroom exit door (on the right) was

nearly identical to the two stall doors:  all three had the same color, had the

same type of door handle, and lined up next to one another.



Exhibit 46.

13.     Mr. Brunsmann was at the sink in the bathroom washing his hands when he

heard an argument behind him, although he did not pay attention to what

was said.  Tr. 1 at 30; Exhibit 38.  Mr. Brunsmann was throwing away a

paper towel when he glanced up.  Tr. 1 at 30.  He saw Mr. O'Connor inside

one of the stalls, facing the toilet.  *Id.* at 30, 42–51; Exhibit 29A.  He witnessed another man — later identified as Defendant — standing to Mr. O'Connor's left, slightly behind him.  Tr. 1 at 30, 42–51; Exhibit 29A.

14. Mr. Brunsmann saw Defendant cock his arm back and punch upward, hitting Mr. O'Connor on the side of the head, near the back of his left ear, hard enough to knock him down.  Tr. 1 at 31–34.  Mr. O'Connor "didn't see it coming."  *Id*. at 32.  Only about five seconds had passed between the argument and the punch.  *Id*. at 33.

15. Mr. O'Connor fell hard and hit his forehead on the toilet before rolling off to the side of the toilet.  *Id*. at 34.  Defendant bent down briefly to examine him, but then took off, quickly leaving the bathroom.  *Id*. at 35.

16. Mr. Brunsmann went after Defendant, yelling "stop" at least twice from about twenty to thirty feet away.  *Id*. at 36–37, 39.  Defendant looked over his shoulder before he ducked into a restaurant on the Ship.  *Id*. at 36, 38. Mr. Brunsmann returned to the restroom to check on Mr. O'Connor, and found that someone else was already helping him.  *Id*. at 40.  Mr. Brunsmann decided to go back to search for the assailant, and enlisted the assistance of some of the Ship's staff.  *Id*. at 52.  Despite looking into the restaurant where he saw the assailant enter, and a nearby bar, Mr. Brunsmann could not locate the assailant.  *Id*.

17.   For three or four days following the assault, Mr. Brunsmann attempted to identify the assailant by examining various photos of the Ship's passengers. *Id*. at 55–56.  On October 28, 2018, he was shown a series of photos of seven different male passengers and identified the photo of Defendant as the person who could have committed the assault.  *Id*. at 56–59; Exhibit 52.

18.   Allen Fidler was also in the restroom at the time of the assault, and had initially attempted to enter the stall where the assault later took place.  Tr. 1 at 167.  The stall was unlocked, but someone was in there, so he went to the closest urinal.  *Id*. at 165–67, Exhibit 43A.  While at the urinal, he heard the sound of a jiggling door knob and a perturbed voice.  Tr. 1 at 167–68.  A few seconds later, he heard a loud thud, followed by a few seconds, and then the quick shuffling of feet out of the restroom.  *Id*. at 168–69.

19.   Mr. Fidler turned around and almost tripped on Mr. O'Connor's feet, which were on the ground.  *Id*. at 170.  He saw Mr. O'Connor's face down on the ground, with his upper torso in the stall and his legs sticking out into the area between the stalls and the sinks.  *Id.* at 170, 179–81; Exhibit 29B.  Mr. Fidler approached Mr. O'Connor, who appeared "real caught off guard" and was shaking, trying to get himself up but could not.  Tr. 1 at 171.  Mr. O'Connor told Mr. Fidler that he had been punched by someone who was

8

"trying to get in" while Mr. O'Connor was "trying to get out." *Id.* at 172. Mr. O'Connor was bleeding from his forehead. *Id.* at 172–73.

20.  Mr. Fidler assisted in the investigation by answering questions.  He also recalled that it seemed like, after the incident, there were announcements nearly every hour on the ship asking people with information about it to go to the front desk. *Id.* at 181–82.  While the precise frequency of the announcements is not in evidence, the Ship broadcasted the announcements approximately three times per day. *See* Tr. 2-2 at 23.

### *Mr. O'Connor's Decline*

#### *October To November 2018*

21.  Mark Sheehan, a registered paramedic, was the Ship's paramedic officer during the cruise.  ECF No. 207 ("Tr. 2-3") at 6.  He responded to the scene of the incident after receiving a 911 call from the Ship's reception. *Id.* When he arrived in the restroom, he saw Mr. O'Connor sitting on the floor of the stall, with blood on the floor. *Id.* at 8; Exhibit 25.

22.  When Mr. Sheehan asked Mr. O'Connor what happened, Mr. O'Connor, who was visibly shaken, indicated that he was trying to leave the bathroom when he was punched in the back of the head.  Tr. 2-3 at 8–9.

23. Mr. O'Connor had a cut to the side of his head, and two small lacerations on each earlobe. *Id*. at 9. Mr. Sheehan took his temperature, pulse, respiration rate, and oxygen saturation; only his blood pressure was abnormal in that it was slightly elevated. *Id*. at 13. Mr. Sheehan did not detect any alcohol on Mr. O'Connor's breath. *Id.* at 15. Mr. O'Connor also told him that he had not lost consciousness. *Id*. at 13.

24. Mr. O'Connor was transported from the restroom to the ship's medical center in a wheelchair. *Id*. at 19–20. At the Ship's medical center, Dr. Nadia Nair tended to Mr. O'Connor, who was still shocked by the incident. Exhibit 108 at 17–18. Mr. O'Connor told Dr. Nair that he was in the men's bathroom, and he was trying to leave the bathroom when there was some altercation with another guest who accused him of not letting him into the bathroom. *Id*. at 20. Mr. O'Connor stated he was knocked on the back of his head and fell forward, and his head hit the toilet bowl. *Id*.

25. Dr. Nair sutured lacerations to Mr. O'Connor's forehead and earlobes. *Id*. at 21–22. Dr. Nair also observed an abrasion to the back of Mr. O'Connor's head. *Id*. at 21. Dr. Nair did not see any injuries to Mr. O'Connor's cheek or jaw. *Id*. at 23.

26. The Ship's medical staff, after examining Mr. O'Connor, provided Mrs. O'Connor with a head injury advice card, directing her what to do with Mr.

O'Connor overnight.  *Id.* at 21; Exhibit 55.  After Dr. Nair completed her treatment of Mr. O'Connor that night, he was returned to his room on the Ship through the use of a wheelchair and placed into his bed with assistance.  Tr. 1 at 142.

27.     The following morning, on October 24, 2018, Mr. O'Connor awoke and found it difficult to maintain his balance.  *Id.* at 128; Exhibit 108 at 34.  Upon getting out of bed, he fell, hit his arm on the wall, and said he could not move his left side.  Tr. 1 at 128.  Mrs. O'Connor called 911, and Mr. O'Connor returned to the medical center by wheelchair around 9:00 a.m.  *Id.* at 129; Exhibit 108 at 33.

28.     Mr. O'Connor was now suffering more severe symptoms, including tremors, instability on his feet, and weakness in his arms.  Exhibit 108 at 34.  These new symptoms were consistent with a secondary brain injury.  *Id.*

29.     Mr. O'Connor's condition worsened throughout the day and, by evening, he was vomiting, experiencing neck pain radiating to the top and back of his head, and involuntary leg spasms.  *Id.* at 35; Exhibit 92 at 16–17.  Mr. O'Connor described his pain level as eight out of ten.  Exhibit 92 at 16.

30.     The Ship's staff determined that Mr. O'Connor needed to be evacuated by helicopter to Hilo Medical Center ("HMC").  Exhibit 108 at 40; Exhibit 92

at 18.  When Mr. O'Connor left the Ship during the early morning hours via military helicopter to HMC, he was in critical condition.  Exhibit 108 at 43.

31.  Dr. Brian Bosscher, whom the Court qualified as an expert in emergency medicine, treated Mr. O'Connor at HMC during the early morning of October 25, 2018.  ECF No. 209 ("Tr. 3") at 56–57, 59.  Dr. Bosscher has at least seventeen years of experience in the field of emergency medicine.  Exhibit 103.

32.  When Dr. Bosscher first encountered Mr. O'Connor, Mr. O'Connor was not responding to verbal commands, not moving any body parts other than those necessary to breathe, his eyes were closed, and he did not respond to any painful stimuli at all four of his extremities.  Tr. 3 at 59.  However, his heart and lungs sounded fine.  *Id*.  Dr. Bosscher ordered a CT scan performed on Mr. O'Connor's head, which revealed a large right intraparenchymal hemorrhage (the right rear part of the brain was bleeding).  *Id*. at 60.

33.  Dr. Bosscher also noticed some masses in Mr. O'Connor's brain scan, but considered those masses "of concern in months to years, potentially" whereas the brain bleed "could be life-threatening in a matter of minutes to hours."  *Id*. at 61.  Dr. Bosscher also discovered masses in Mr. O'Connor's lungs and liver.  *Id*. at 76.

34.     Immediately after his CT scan, Mr. O'Connor began to vomit.  *Id*. at 61.

Because Mr. O'Connor was not entirely conscious, his vomiting presented a

deadly situation:  without a gag reflex, he could suck vomit into is lungs and

injure them, and potentially aspirate and die.  *Id*. at 62.  Dr. Bosscher

intubated Mr. O'Connor.  *Id*.  Dr. Bosscher likely saved Mr. O'Connor's

life.

35.     Given what he saw in the CT scan, Dr. Bosscher expected Mr. O'Connor

would have problems functioning on the left side of his body.  *Id*. at 68.

Because of Mr. O'Connor's life-threatening condition, and HMC's lack of

neurosurgical capability, he was transported to Queen's Medical Center

("QMC") that same day.  *Id*. at 68–69, 78.

36.     Once Mr. O'Connor was at QMC, Dr. Tae Rho, whom the Court qualified as

an expert in neuroradiology, became involved in Mr. O'Connor's care.  ECF

No. 199 ("Tr. 2-1") at 6, 12.  In his over thirty years of experience, Dr. Rho

has examined the scans of hundreds to thousands of individuals who had

suffered from head trauma, and thousands of individuals with brain tumors.

*Id*. at 10–11.

37.     Dr. Rho examined an MRI of Mr. O'Connor's brain, dated October 25,

2018.  *Id.* at 19.  He confirmed that Mr. O'Connor had several brain tumors

that had developed from his skin cancer.  *Id*. at 21.  There was also evidence

of a large blood clot, right next to one of the tumors.  *Id*. at 21.  Dr. Rho concluded that the blood clot was the result of the shearing of the tumor against brain matter at the time Mr. O'Connor hit his head following the assault.  *Id*. at 22, 33, 59.  The midline of Mr. O'Connor's brain also shifted to the left, which was caused by the large blood clot.  *Id*. at 26, 28.  Such a shift is a sign that the brain is being compressed, which can cause a loss of strength and mobility, and confusion.  *Id*. at 27–29.

38.    Mr. O'Connor remained at QMC for an extended period of time, during which he obtained physical therapy treatment.  He had his first physical therapy evaluation on November 5, 2018.  ECF No. 208 ("Tr. 2-4") at 53.  He was lethargic and generally incapable of doing anything without relying on someone else.  *Id*. at 56–60.  His last physical therapy session was on November 26, 2018.  *Id*. at 63.  By then, he had improved slightly, but he was still unable to sit up without assistance.  *Id*. at 65–66.  He was not ambulatory, and was unable to stand or walk, although he was engaged and appeared to want to improve.  *Id*. at 66–67.

39.    On November 28 to 29, 2018, Mr. O'Connor was transported via commercial airline to California.  *Id.* at 76, 107, 108.  At that point he remained immobile.  *Id*. at 79.  He was then taken to the Emergency Room at Arcadia Methodist Hospital ("AMH").  *Id*. at 108–09.

40.    On November 29, 2018, Mr. O'Connor met with Dr. Samuel Chung — one

of the doctors who had considered treating Mr. O'Connor's metastatic

melanoma. ECF No. 209 ("Tr. 3") at 7.  Dr. Samuel Chung has worked for

the City of Hope National Cancer Center for eleven years, and the Court

qualified him as an expert in the fields of medical oncology and hematology.

*Id.* at 6–7, 12.

41.    Dr. Chung determined that Mr. O'Connor was in too compromised a

condition to receive any therapy, in part because he was likely unable to

tolerate the side effects.  *Id*. at 10.  At that time, Mr. O'Connor suffered from

Stage IV metastatic melanoma, with tumors in his brain and lungs.  *Id*. at 14.

42.    Because Mr. O'Connor had brain tumors, Dr. Chung estimated that his

median overall survival with immunotherapy "could be around 11 to 12

months," in other words, half of the individuals with brain tumors who

received immunotherapy lived more than eleven to twelve months from

diagnosis and half lived less.  *Id*. at 16.  Prior to the advent of

immunotherapy, patients were living three to six months.  *Id*. at 27.

43.    Dr. Chung also testified that cancer has a high rate of thromboembolism.  *Id.*

at 27–28.

44.    Dr. Chung opined that the radiation that Mr. O'Connor received at QMC

would have stabilized the brain tumors such that they would not have

15

resulted in problems in the future. *Id*. at 40. Dr. Chung also said that protracted immobility is another risk factor for thromboembolism, but that it was "hard to say" how significant a risk factor it was; but he later clarified that Mr. O'Connor's inability to walk presented a significant risk factor for developing thromboembolism. *Id*. at 41, 44.

45.   Dr. Chung acknowledged that Mr. O'Connor's Stage IV metastatic melanoma was found incidentally, rather than because Mr. O'Connor was suffering from any symptoms, but that did not change the three-to-six-month average survival rate for individuals with that condition who do not receive immunotherapy. *Id*. at 46–47.

46.   He also stated that confusion can be a sign of brain tumors. *Id*. at 49.

### December 2018 To February 2019

47.   After he was discharged from AMH, Mr. O'Connor went to the Huntington Rehabilitation Facility ("HRF") on December 20, 2018. ECF No. 210 ("Tr. 4") at 8, 61; Exhibit 95 at 1838. Mr. O'Connor continued to remain immobile and had mentally declined as compared to before the assault, exhibiting confusion and memory loss. Tr. 4 at 62–64; Exhibit 14. He also strained to speak. Tr. 4 at 62. While at HRF, Mr. O'Connor's son was able to find a cancer center willing to treat his metastatic melanoma. *Id*. at 67–68. He attended one immunotherapy session in January 2019, but passed

away on February 6, 2019, before he could attend his second session.  *Id*. at

68–69.

### *The Ongoing Investigation*

48.   The investigation into the events in the Ship's bathroom continued in the

course of the cruise and initially did not result in any suspects.  However, on

October 26, 2018, a break in the case arose during a luau in Honolulu.  On

that date, passenger Ann Gagne was seated at a picnic table at Germaine's

luau, across from Defendant.  Tr. 3 at 169–71.

49.   In the course of the evening, she witnessed Defendant take his wife's hands

and say, "I have something I want to tell you, and I was going to tell you

sooner, but it was our anniversary and I didn't want to ruin it."  *Id*. at 174.

He then proceeded to tell his wife that he was in a bathroom stall when a

man started to pound on his door, and when he opened the door, a man

pushed the door into the stall.  *Id*. at 175.  He described how he managed to

get past the man, and when he did so, the man kicked Defendant on the back

of the legs, so he turned around and hit him.  *Id*.  Defendant told his wife

that the man's "eyes were still open, so [he] just left."  *Id*.  He could hear a

man in a stall saying, "Call security."  *Id*. at 176.

50.   Ms. Gagne did not report what she had overheard until the night of October

27, 2018, when she returned to the Ship and mentioned the events at the

luau.  *Id*. at 181.  Her friends told her that the man in the bathroom had been injured and was going to be airlifted off the Ship, and that the captain had asked if anyone had seen anything.  *Id*.  Ms. Gagne described Defendant to security and identified him after looking at a series of 300 photos of male passengers between the ages of 65 and 75.  *Id*. at 181–82.

### *Defendant's Interrogation*

51.    Once Defendant was identified, he was interviewed by the Coast Guard and the Federal Bureau of Investigation on October 28, 2018.  Exhibits 82A, 82B, 83.  During the interview, Defendant was read his *Miranda* rights and waived them.  Exhibit 83 at 1–3.

52.    Defendant admitted to being in the men's bathroom the evening of the assault and said he was using the toilet in a stall that was "a very small area." *Id*. at 6.  While he was sitting on the toilet, he suddenly "hear[d] the door jiggle."  *Id*.  The person persisted, and once Defendant finished, he opened the door and Mr. O'Connor started to enter the stall.  *Id*.  According to Defendant, he "kind of push[ed] back on" Mr. O'Connor and asked, "please let me get out and you're welcome to come on in."  *Id*.  Defendant indicated that after that, Mr. O'Connor still continued to try to enter, and he asked Mr. O'Connor to let him out.  *Id*. at 6–7.  Defendant claimed that Mr. O'Connor pushed him back in again.  *Id*. at 7.

53.     Defendant stated that he was able to push Mr. O'Connor to get out of the

        stall, but as he passed him, Mr. O'Connor kicked him "right in the back of

        the foot," which caused pain on the level of five or six out of ten.  *Id*. at 7–8,

        27.

54.     After the kick, "there wasn't even any thought to it" he "just spun and hit

        him."  *Id*. at 13.  Defendant admitted that, at that point, he "turned around

        and hit him one time" with his right hand and "he went down."  *Id*. at 8.

        Defendant also confessed that he then left, despite hearing someone calling

        for security.  *Id*. at 8, 10.  Defendant's right hand was still swollen at the

        time of the interview.  *Id*. at 10–11.

55.     Defendant claimed that Mr. O'Connor's behavior caused him to think three

        things at the time of the incident:  (1) that Mr. O'Connor was "mentally ill";

        (2) that Mr. O'Connor was drunk; or (3) that he was interested in a sex act.

        *Id*. at 7.

56.     The Court does not find credible Defendant's statement in the interview

        regarding what he suspected about Mr. O'Connor at the time of the incident.

        First, Defendant had five days to consider what to say if contacted by

        investigators.  Second, he fled the scene of the incident; as a former law

        enforcement officer, *id*. at 4, he knew that the best way to explain what

        justified his punch was to wait and tell the investigators.  Third, the tone of

Defendant's voice when describing the incident was rather matter-of-fact, which gives the Court pause as to his credibility when describing what he thought might have been sexual aggression. Fourth, Defendant acknowledged that these three theories were rendered "[i]n hindsight." *Id*. at 14.

57. The Court also does not find credible Defendant's recitation as to how polite he was to Mr. O'Connor when trying to exit the stall. The Court suspects that when Mr. Fidler opened the door to the same stall moments before the altercation, only to find someone was in the unlocked stall, the person in the stall was Defendant. Given the small size of the stall, Defendant likely locked the stall before Mr. O'Connor then tried to open the door. Whether this suspicion is accurate or not, the Court finds that Defendant was angered by Mr. O'Connor's attempt to enter the stall. Defendant claimed that he "didn't want to get in a big confrontation, just having [had] open heart surgery," but his reaction to Mr. O'Connor suggested that he was not focused on his heart health at the time of the incident. *Id*. at 12.

58. Defendant also claimed that he had had only one lemon drop the night of the incident, and that was the only drink he had the entire cruise. *Id*. at 16. But Ms. Gagne testified to witnessing him sip Mai Tais at the luau. Tr. 3 at 174.

This further suggests that Defendant lied, at least in part, during his interrogation.

59. Defendant also admitted that he did not tell his wife or the other people he was with on the cruise until the day before the interview because "enough time had gone by and nothing had happened, so [he] thought it was a moot issue." Exhibit 83 at 19. This suggests that he had deliberately waited to see if he was in trouble before telling his wife; in other words, he knew he could be in trouble for what he had done. *Id*. at 19–20.

60. Defendant also admitted to being aware that someone on the Ship was evacuated, and worrying that the person evacuated was the one he hurt. *Id*. at 21. When asked why he did not tell anyone, even after learning the information about the evacuee, Defendant responded, "I didn't really think in my mind that I did anything wrong, and, you know, I thought I didn't want to get involved in a big deal. . . . I've been around courts and the legal system, . . . and I just didn't want to -- for it to go any further." *Id*. at 22. He also acknowledged that he could have just walked away from the kick, but that "it was just a self-defense, gut reaction." *Id*. At the time of the interview, there was no bruising on his leg, nor any other visible sign that Mr. O'Connor had kicked him. *See* Exhibits 21, 21A.

### *Mr. O'Connor's Death And Autopsy*

61.   On February 6, 2019, Mr. O'Connor was taken to the Emergency Room at
      AMH, where he died of a pulmonary thromboembolism (a blood clot in his
      lung).  Exhibit 100 at MCAVAY_000466–67; ECF No. 169.

62.   The medical record from that event reflected, "Patient is bed bound since
      December 20, 2018, but is normally conversant . . . [P]ulmonary embolism
      is high on the differential given the redness of the shortness of breath *and
      the underlying history of melanoma*."  Exhibit 95 at MCAVAY_003116–17
      (emphasis added).  A chest CT scan revealed a pulmonary embolism
      "beginning in the right main pulmonary artery and right lower lobe
      pulmonary arteries."  *Id.*  On February 6, 2019, he also had a "right sided
      lung mass which appear[ed] larger than previous," *id.* at
      MCAVAY_003124, and additional masses on his right and left lungs.  *Id.*

63.   Eight days later, Dr. Kevin Young of the Los Angeles County Department of
      Coroner performed an autopsy on Mr. O'Connor's body.  Tr. 3 at 80–81, 83;
      ECF No. 169.  The Court qualified Dr. Young as an expert in the field of
      medicine with a specialty in forensic pathology.  *Id.* at 83.  Dr. Young has
      served as a deputy medical examiner for 14 years, and has conducted over
      3,000 autopsies.  *Id.* at 81.

64.  At the time of the autopsy, the pulmonary embolism was no longer evident due to the treatment for the embolism during the efforts to save Mr. O'Connor's life.  *See* Exhibit 100 at MCAVAY_000468.  The autopsy revealed that Mr. O'Connor indeed suffered from metastatic melanoma, which included a three-and-a-half centimeter mass on his right middle lung, a two centimeter mass in his left lower lung, and over a dozen one to one-and-a-half centimeter tumors in his liver.  *Id.*  He also suffered from arteriosclerotic cardiovascular disease, had one stent in his left artery, with an 85 percent blockage proximal to the stent.  *Id.*; Tr. 3 at 117.

65.  Dr. Cho Lwin, a forensic neuropathology consultant who was not called as a witness, wrote a report of his examination of Mr. O'Connor's brain, which was admitted by stipulation.  Exhibit 100; Tr. 1 at 218; ECF No. 188.  Dr. Lwin's report determined that Mr. O'Connor had malignant melanoma to the brain, which included "[m]ultiple dark brain metastasis."  Exhibit 100 at MCAVAY_000480–81.  Dr. Lwin's report also acknowledged a "5-centimeter cystic cavity in the right brain," which evidenced the past brain bleed.  *See* Tr. 3 at 156–57.

66.  Dr. Young determined that Mr. O'Connor died of a pulmonary thromboembolism, caused by his immobility, which he suffered due to the blunt head trauma at the time of the assault three and a half months prior.

23

*Id.* at 91–93.  He characterized the metastatic melanoma as "a contributing condition" and testified that "immobility is a major risk factor for developing [a pulmonary embolism], and that's what he died of."  *Id*. at 93. Dr. Young explained that an inability to walk, in particular, can cause a clot in the legs, which can go to the lungs.  *Id*. at 95.

67.   He acknowledged that the metastatic melanoma can cause clots, but that he took that into consideration when reaching his opinion as to the cause of death.  *Id*. at 96.

68.   He testified that the head trauma shortened Mr. O'Connor's lifespan.  *Id*. at 98.

69.   But when discussing his report with agents in July of 2019, Dr. Young characterized the case as a "weak homicide."  *Id*. at 100.  During trial, he acknowledged under cross examination that some individuals can remain immobile for many years and will not suffer from pulmonary embolisms, with certain medical interventions.  *Id*. at 113–14.  He also admitted that "the survival period hindered forensic examination of the initiating events" and that "the head trauma by itself was non-fatal."  *Id*. at 133.

70.   When questioned by the Court, Dr. Young stated that, based on his experience, he cannot determine by autopsy whether immobility or cancer is more likely the cause of a thromboembolism.  *Id.* at 167.

## CONCLUSIONS OF LAW

### I.      Jurisdiction Under 18 U.S.C. § 7(8)

The requisite jurisdictional elements have been stipulated by the parties and are satisfied here.  "Special maritime and territorial jurisdiction of the United States" is defined in 18 U.S.C. § 7, and it includes "[t]o the extent permitted by international law, any foreign vessel during a voyage having a scheduled departure from or arrival in the United States with respect to an offense committed by or against a national of the United States."  18 U.S.C. § 7(8).  While federal jurisdiction over the place may be determined as a matter of law, the locus of the offense within that place is an issue for the finder of fact.  *See United States v. Gipe*, 672 F.2d 777, 779 (9th Cir. 1982).

As set forth in the stipulation as to jurisdiction, Defendant McAvay is and has been a citizen and national of the United States at all relevant times charged in the Superseding Indictment.  ECF No. 194 at 2.  Mr. O'Connor, the decedent, was a citizen and national of the United States at all relevant times charged in the Superseding Indictment.  *Id.*  The Ship was a foreign vessel of Bermuda registry at all relevant times charged in the Superseding Indictment.  *Id.*

On October 23, 2018, the Ship was in the middle of a voyage, having a scheduled departure from and arrival in the United States.  *Id.*  The Ship had a scheduled departure date of October 20, 2018, from Los Angeles, California, and

had a scheduled arrival date of October 25, 2018, at Hilo, Hawaiʻi. *Id.* The Court

concludes as a matter of the law that the crimes charged against Defendant in

Counts 1 and 2 of the Superseding Indictment occurred within the special maritime

and territorial jurisdiction of the United States.

## II.     Count 2 — Assault Resulting In Serious Bodily Injury

The Court begins with Count 2 because it is the easier decision. The Court

finds Defendant GUILTY of Assault Resulting in Serious Bodily Injury.

### A.     Elements

In order for Defendant to be found guilty of Assault Resulting in Serious

Bodily Injury, the Government must prove beyond a reasonable doubt that (1)

Defendant assaulted Mr. O'Connor by intentionally striking him; (2) as a result,

Mr. O'Connor suffered serious bodily injury; and (3) the assault took place within

the special maritime and territorial jurisdiction of the United States. *See, e.g.*,

*United States v. Pierre*, 254 F.3d 872, 874 (9th Cir. 2001); Ninth Circuit Model

Criminal Jury Instructions No. 8.8 (Assault Resulting in Serious Bodily Injury); 18

U.S.C. § 113(a)(6).

"The *mens rea* requirement is that the volitional act be willful or intentional;

an intent to cause injury is not required." *United States v. Lewellyn*, 481 F.3d 695,

697 (9th Cir. 2007) (citation omitted). "'Serious bodily injury' means bodily

injury that involves (1) a substantial risk of death; (2) extreme physical pain; (3)

26

protracted and obvious disfigurement; or (4) protracted loss or impairment of the function of a body part, organ, or mental faculty." Ninth Circuit Model Criminal Jury Instructions No. 8.8 (Assault Resulting in Serious Bodily Injury); *see* 18 U.S.C. §§ 113(b)(2), 1365(h)(3).

"Proximate cause is not a necessary element of every crime[,]" *United States v. Houston*, 406 F.3d 1121, 1123 (9th Cir. 2005), and it does not extend to Count 2, where foreseeability is not "implicit in the common understanding of the crime" being prosecuted. *United States v. Main*, 113 F.3d 1046, 1050 (9th Cir. 1997) (citation omitted).

**B.    Analysis**

The Government has proven beyond a reasonable doubt the elements of this offense. Defendant admitted that he punched Mr. O'Connor in the head, and it is obvious that it was intentional. Defendant argues that the Government cannot prove the intent element because the shear brain injury is not a "natural and probable consequence" of Defendant's punch. ECF No. 212 at 14. But Defendant's argument is misguided. "Under federal law, assault resulting in serious bodily injury is a general intent crime which does not require proof of specific intent to injure the victim." *United States v. McInnis*, 976 F.2d 1226, 1233 (9th Cir. 1992) (citation omitted). Defendant McAvay intentionally punched Mr. O'Connor in the back of the head with at least a reckless disregard as to whether he

27

would be injured.  Such conduct satisfies the general intent requirement.  *See id.* at

1233–34.

It is equally clear that the second element is met:  that, as a result of being

assaulted, Mr. O'Connor suffered serious bodily injury.  The Government has

proven beyond a reasonable doubt that Defendant punched Mr. O'Connor on the

rear left side of his head, causing him to fall and hit his head, resulting in a blunt

force head trauma.

That trauma caused Mr. O'Connor a range of serious bodily injuries,

including extreme physical pain.  Witnesses testified that they observed Mr.

O'Connor in pain and discomfort at various points on October 24, 2018, and the

medical records reflect that he experienced neck pain radiating to the top of his

head on October 24, 2018.

Defendant's assault also placed Mr. O'Connor at substantial risk of death.

Mr. O'Connor was in critical condition when he left the Ship, meaning there was a

high risk of death.  He required rapid intubation when he arrived at HMC;

otherwise, he risked aspirating on his own vomit and dying.  And, as more

thoroughly discussed below, the assault caused the brain bleed, which caused the

cognitive and physical impairments, including confusion, memory loss, and

immobility.  The close temporal proximity between the strike to the head and Mr.

O'Connor's critical condition (which was severe enough to warrant an emergency

evacuation) establishes beyond a reasonable doubt a causal connection between the two.  Dr. Rho's testimony that the brain bleed would not have occurred but for the assault bolsters that conclusion.

### C.     Self-Defense

Defendant has failed to establish a prima-facie case of self-defense as to Count 2.  Alternatively, even if it were the case that Defendant had met his burden to establish a prima-facie case of self-defense, the Government has met its burden to establish beyond a reasonable doubt that the Defendant's use of force was not justified under the law of self-defense as to Count 2.

#### 1.     Defendant Failed To Establish A Prima-Facie Case Of Self-Defense

Defendant has failed to establish a prima-facie case of self-defense as to Count 2.  "In order to make a prima-facie case of self-defense, a defendant must make an offer of proof as to two elements:  (1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) the use of no more force than was reasonably necessary in the circumstances."  *United States v. Biggs*, 441 F.3d 1069, 1071 (9th Cir. 2006) (citation omitted).  And so, a use of force that is *either* objectively unreasonable *or* not actually believed by the defendant to be reasonable is not justified under the law of self-defense.  *See id.*  And, "[f]orce likely to cause death or great bodily harm is justified in self-defense only if a person reasonably believes

that such force is necessary to prevent death or great bodily harm." Ninth Circuit Model Criminal Jury Instructions No. 5.10 (Self-Defense); *see generally United States v. Keiser*, 57 F.3d 847, 851 (9th Cir. 1995).

The Court has already found Defendant's claimed reasons for the punch to be unbelievable. Similarly, there is no reason to conclude that Defendant's use of force was necessary to defend himself or another against the immediate use of unlawful force. Mr. Brunsmann credibly testified that he saw Defendant punch Mr. O'Connor on the side of his ear with a closed right fist. At that moment, there was no immediate use of unlawful force to protect against. And it is worth noting that the size of the bathroom stall was very small — four feet ten inches by three feet two inches. Exhibit 29. Defendant was aware that the stall was cramped and that there were walls and a toilet against which Mr. O'Connor would likely fall.

The Court is persuaded, after listening to the interrogation of Defendant, that he was not in fact afraid of Mr. O'Connor; rather, he was angry at him and acted out of aggression. After getting past Mr. O'Connor in the Ship's small bathroom, Defendant could have simply walked away but instead sucker-punched Mr. O'Connor from somewhat behind him.

As to whether Mr. O'Connor kicked Defendant, no one testified to seeing Mr. O'Connor do so. But even assuming Mr. O'Connor kicked Defendant in the back of the leg, the kick was not terribly painful. Defendant rated the pain a five or

30

six on a scale of one to ten, and the kick was not of sufficient force to leave any type of bruising on Defendant or draw the attention of persons nearby. Accordingly, the circumstances make clear that the amount of force used by Defendant in his assault of the victim was disproportionate to any supposed kick Defendant received from the victim.  Indeed, even if there was a kick, it did not prompt Defendant to report it to Ship security or seek medical attention.

But perhaps the most damning evidence against Defendant's self-defense claim was his flight from the scene which showed that he knew he was in the wrong and did not subjectively believe he was in danger.  He never called for help. He never reported the incident to Ship security.  As a former law enforcement officer, he would have known that the best way to explain an action of self-defense would be to wait for investigators to explain it, or to proactively report it.  Instead, he took off after punching Mr. O'Connor, despite Mr. Brunsmann's repeated calls for him to stop.  Defendant knew he did wrong, and he did not want to get caught.

> ### 2. Alternatively, The Government Met Its Burden To Establish Beyond A Reasonable Doubt That Defendant's Use Of Force Was Not Privileged Under The Law Of Self-Defense

Even if Defendant had established a prima-facie case of self-defense, the Government has met its burden to establish beyond a reasonable doubt that the Defendant's use of force was not justified under the law of self-defense.  The Court incorporates the prior paragraphs by reference.

31

"[T]he right of self-defense does not justify an act of revenge or retaliation."

*United States v. Rice*, 673 F.3d 537, 542 (7th Cir. 2012) (citation omitted).  A

"surprise, pre-emptive attack" is not self-defense.  *United States v. Urena*, 659

F.3d 903, 907 (9th Cir. 2011).  In a similar vein, "self-defense is not available to

one who renews a confrontation which has ended."  *United States v. Nolan*, 700

F.2d 479, 484 (9th Cir. 1983) (citation omitted).

The Government proved beyond a reasonable doubt that Defendant did not

reasonably believe the force he used was necessary for the defense of himself or

another against the immediate use of unlawful force.  Defendant admitted in his

statement to law enforcement that he could have walked away.  Defendant

admitted that he struck Mr. O'Connor *after* Defendant had gotten past him.  Mr.

O'Connor had his back turned away from Defendant.  He posed no threat to

Defendant.

## III.   Count 1 — Involuntary Manslaughter

### A.   Elements

For Defendant to be found guilty of Involuntary Manslaughter, the

Government must prove beyond a reasonable doubt that (1) Defendant committed

an act that might produce death; (2) Defendant acted with gross negligence,

defined as wanton or reckless disregard for human life; (3) Defendant's act was the

proximate cause of the death of Mr. O'Connor; (4) the killing was unlawful; (5)

Defendant either knew that such conduct was a threat to the lives of others or knew of circumstances that would reasonably cause Defendant to foresee that such conduct might be a threat to the lives of others; and (6) Defendant's act occurred within the special maritime and territorial jurisdiction of the United States.  *See* 18 U.S.C. § 1112; Ninth Circuit Model Criminal Jury Instructions No. 16.4 (Manslaughter — Involuntary); *see also* 18 U.S.C. § 3236 ("In all cases of murder or manslaughter, the offense shall be deemed to have been committed at the place where the injury was inflicted, or the poison administered or other means employed which caused the death, without regard to the place where the death occurs.").

## B.    Causation

In a case such as this where the proof of the crime requires both conduct and a specific result, "a defendant generally may not be convicted unless his conduct is both (1) the actual cause, *and* (2) the legal cause (often called the proximate cause) of the result."  *Burrage v. United* States, 571 U.S. 204, 210 (2014) (internal quotation marks and citations omitted) (emphasis added); *see also Main*, 113 F.3d at 1050.

### 1.    Actual Or But-For Cause

Actual cause is also known as "but-for" cause.  *See Burrage*, 571 U.S. at 211.  The Supreme Court utilized an illustration to explain what but-for cause is:

33

> [W]here A shoots B, who is hit and dies, we can say that A actually caused B's death, since but for A's conduct B would not have died. The same conclusion follows if the predicate act combines with other factors to produce the result, *so long as the other factors alone would not have done so* — if, so to speak, it was the straw that broke the camel's back. Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived.

*Id*. (internal quotation marks, brackets, and citations omitted) (emphasis added). In *Burrage*, a drug addict died of an overdose following a lengthy use of drugs, including heroin, at least some of which he purchased from the defendant. *See id*. at 206. The two experts in that case determined that heroin was a contributing factor to the death, but one "could not say whether [the man] would have lived had he not taken the heroin," and the other "could not say whether [the man] would have lived had he not taken the heroin, but observed that [his] death would have been very less likely." *Id*. at 207 (internal quotation marks, brackets, and citation omitted).

## 2. Proximate Cause

"A proximate cause is one which played a substantial part in bringing about the death, so that the death was the direct result or a reasonably probable consequence" of the defendant's conduct. *Main*, 113 F.3d at 1050. To that end, "the harmful result must be within the risk foreseeably created by the accused's conduct." *Id.* at 1049. "Foreseeability is to be determined by what a reasonable

person would foresee as a reasonable probability within the risk of the conduct engaged in." *Id.*

### C. Analysis

The Court turns to the question of whether, but for the assault, Mr. O'Connor would have died of a pulmonary embolism when he did. Because the answer to that question is not clear, there is reason to doubt that the answer to it is yes.

It is helpful to start with the causation dots that Dr. Young attempted to connect in his testimony. Dr. Young essentially testified that in his opinion Mr. O'Connor died from a pulmonary embolism, caused by immobility, which was caused by a brain bleed, which was caused by the assault. The Court examines each link in reverse order.

### 1. The Government Proved Beyond A Reasonable Doubt That The Assault Caused The Brain Bleed.

Dr. Young and other witnesses credibly testified that the assault caused the brain bleed. As Dr. Young explained, the proximity between the assault and Mr. O'Connor's nearly immediate deterioration is ample proof of this. Whether Mr. O'Connor would have suffered the brain bleed without his brain tumors does not matter here because "a victim's pre-existing condition does *not* relieve a perpetrator from the consequences of his or her actions if those actions caused or hastened death." *United States v. Long Feather*, 299 F.3d 915, 917 (8th Cir. 2002)

35

(citations omitted) (emphasis added) (applying 18 U.S.C. §§ 1112 and 113(a)(3), and 113(a)(6)); *see id.* ("[A] defendant must take his victim as he finds him." (citations omitted)).  If he had not been assaulted, Mr. O'Connor's brain would not have spontaneously bled in the manner it did.

### 2. The Government Proved Beyond A Reasonable Doubt That The Brain Bleed Caused Mr. O'Connor's Immobility.

Temporal proximity again proves that Mr. O'Connor became immobile because of the brain bleed.  Within 24 hours, Mr. O'Connor went from an active life of dancing and exercise to one where he was incapable of moving the left side of his body, walking, or sitting.  There is no doubt that, if the brain bleed had not occurred, Mr. O'Connor would have been able to continue to walk, dance, and exercise, at least for an undetermined period of time.

### 3. The Government Failed To Prove Beyond A Reasonable Doubt That The Immobility Caused Mr. O'Connor's Death By Pulmonary Thromboembolism.

"[T]he reasonable-doubt standard is indispensable, for it impresses on the trier of fact the necessity of reaching a *subjective state of certitude* of the facts in issue." *In re Winship*, 397 U.S. 358, 364 (1970) (internal quotation marks and citation omitted).  The Ninth Circuit Model Jury Instructions incorporate this requirement, explaining, "[p]roof beyond a reasonable doubt is proof that leaves you *firmly convinced* the defendant is guilty.  It is not required that the government

prove guilt beyond all possible doubt." Ninth Circuit Model Criminal Jury Instructions No. 6.5 (Reasonable Doubt — Defined) (emphasis added).

There is no reason for the Court to doubt that Mr. O'Connor died on February 6, 2019 of a pulmonary embolism. The doctors at AMH attempted to treat him for it, and Dr. Young concluded that, despite there being no evidence of the pulmonary embolism at the time of the autopsy due to the treatment effort, Mr. O'Connor died from a pulmonary embolism because he was so "diagnosed in the hospital." Tr. 3 at 87. But what caused the pulmonary embolism is a harder question and gets to the heart of the but-for causation analysis.

While there is no doubt that immobility is a risk factor for blood clots, cancer is also a risk factor. Indeed, Dr. Chung — an expert in the fields of medical oncology and hematology — testified that cancer has a high rate of thromboembolism. Tr. 3 at 27–28. And Dr. Young, who is an expert in the field of forensic pathology, acknowledged that metastatic melanoma can cause blood clots. *Id.* at 96. The reasonable conclusion from this evidence is that cancer patients who do not suffer from immobility may still develop pulmonary embolisms. Further, Dr. Young acknowledged that immobile people can live for years without developing blood clots. *Id.* at 112–13. And, taking the foregoing facts together, it is reasonable to conclude that immobility and cancer can both *independently* cause blood clots in the absence of the other.

The Court now turns to the evidence of both the cancer and the immobility Mr. O'Connor suffered to determine whether the Government proved beyond a reasonable doubt that the immobility caused the embolism, either with the cancer as a contributing factor, or standing alone.

There is overwhelming evidence that Mr. O'Connor's cancer was serious. The pulmonary embolism Mr. O'Connor suffered began in the right main pulmonary artery and right lobe pulmonary arteries.  Exhibit 95 at MCAVAY_003123.  At the time of his death, he also had the following:  (1) a lung mass on his right side that had grown since the last scan, *id.* at MCAVAY_003124, which might also be the mass that was measured at three-and-a-half centimeters in his right middle lung at the time of autopsy, Exhibit 100 at MCAVAY_000468; (2) more masses on his right and left lungs, *id.*, one of which was likely identified during the autopsy as measuring two centimeters on his left lower lung, *id.*; and (3) over a dozen smaller tumors in his liver.  *Id*.  The foregoing masses are in addition to the tumors evident in his brain.  *See* Tr. 3 at 89; Tr. 2-1 at 15.  A reasonable inference from this information is that Mr. O'Connor's cancer was widespread. Indeed, there was no dispute that he was diagnosed with Stage IV cancer shortly after he was assaulted.

The Court also acknowledges that Mr. O'Connor had been immobile for three and a half months at the time of his death, and that people who are immobile

are at serious risk of developing embolism.  Notably, while Dr. Chung testified that an inability to walk presented a significant risk factor for developing thromboembolism, *see* Tr. 3 at 41, 44, he initially testified that it was "hard to say" how significant a risk factor it was.  *Id.* at 41, 44.  He did not testify that it was more of a risk factor than cancer.

So the question is:  did the cancer, the immobility, or a combination of both cause the lung clot?  Determining the independent or combined effects of the cancer and immobility is more complicated because of the fact that Mr. O'Connor's metastatic melanoma would likely not have been discovered on or about October 24, 2018 had it not been for the assault.  To try to diminish any possible independent effect of the cancer, the Government argues that the immobility resulting from the assault prevented Mr. O'Connor from obtaining immediate cancer treatment, and thereby hastened his death.  ECF No. 213 at 10–11.  But the Government's argument presumes that the metastatic melanoma would have otherwise been discovered.  And it requires speculation that Mr. O'Connor would have been eligible for and would have received immunotherapy treatment earlier than January 2019 — when Mr. O'Connor had his first session — even if the cancer had been discovered.

The reality is that no one knows — or at least no evidence was offered to show — when Mr. O'Connor's cancer would likely have been discovered if the

assault did not happen.  There was some testimony that, after the removal of the skin cancer in 2017, Mr. O'Connor's doctor periodically examined him to make sure it had not spread.  Tr. 1 at 158.  But assuming that such examinations were frequent and thorough only suggests that the cancer was aggressive when discovered.

Additionally, the evidence at trial regarding the life expectancy for individuals suffering from Stage IV metastatic melanoma fails to refute the reasonable possibility that the cancer independently caused the pulmonary embolism.  Dr. Chung testified that people with untreated Stage IV metastatic melanoma have a median survival rate of three to six months from diagnosis, which means that half the patients live less than that range and half live longer than that range.  Tr. 3 at 16, 27.  Those who have metastatic melanoma in the form of brain tumors and receive immunotherapy have an overall median survival rate of "around 11 to 12 months," which again means that half of the patients live longer and half of the patients live less.  *Id*. at 16.

Mr. O'Connor passed away three and a half months after the assault — square within the median range for untreated patients.  This means that his death from a pulmonary embolism three and a half months after the metastatic melanoma was discovered (shortly after the assault) is not so unlikely an outcome for cancer alone.  Even if he had been able to obtain treatment, half of treated patients die

before the eleven to twelve month range.  And the Government did not present

sufficient evidence that beginning immunotherapy at the end of November 2018 —

when Dr. Chung first evaluated Mr. O'Connor — as opposed to January 2019

would have significantly reduced or eliminated the risk of developing a pulmonary

embolism in February 2019.  So there is a reasonable doubt as to whether the

assault hastened his death.

It is true that Dr. Young testified — consistent with his autopsy report —

that, within a reasonable degree of medical certainty, he believed the immobility

caused the pulmonary embolism.  But after he wrote that report, and with the

benefit of hindsight and before trial, he characterized this as a weak homicide case.

Moreover, he testified that, based on his training and science, he could not tell

from an autopsy examination whether cancer or immobility was more likely to

have caused the pulmonary embolism.

The Court is left wondering, then, why Dr. Young concluded that it was the

immobility in particular that caused the pulmonary embolism, where there was

ample testimony that both cancer and immobility are significant risk factors.  In

fact, the AMH doctors suspected that Mr. O'Connor was suffering from a

pulmonary embolism because of his appearance and his *metastatic melanoma*,

even though they were aware of his immobility.  *See* Exhibit 95 at

MCAVAY_003116–17 ("Patient is bed bound since December 20, 2018, but is

normally conversant . . . [P]ulmonary embolism is high on the differential given the redness of the shortness of breath *and the underlying history of melanoma*." (emphasis added)).

The Government posits that both the immobility and the cancer could serve as concurrent contributing causes of the pulmonary embolism. ECF No. 213 at 9. While the Court does not doubt this is a reasonable theory, no one explained why it is unreasonable to believe that the cancer alone caused the pulmonary embolism, given the facts presented. Indeed, trying to walk back the "weak" comment, Dr. Young said himself, "there are many complicating factors in a three-and-a-half month interval." Tr. 3 at 100. Similarly, while Dr. Young testified that the head trauma shortened Mr. O'Connor's life, that conclusion appears tied to Mr. Young's belief that the immobility caused the pulmonary embolism. As the Court has explained, the evidence in the record does not leave the Court firmly convinced that Mr. O'Connor would not have suffered the blood clot on the same date absent his immobility.

While it is not clear from the record that Dr. Young relied on temporal proximity, at least in part, to render his opinion that the immobility caused the embolism, the Court considers whether the temporal proximity between the immobility and the embolism explains the conclusion. The temporal proximity theory works well for the conclusion that the assault caused the brain bleed and the

brain bleed caused the immobility.  But it is not as convincing when evaluating whether the immobility caused the embolism.

Dr. Rho explained why the tumors in Mr. O'Connor's brain had not spontaneously bled.  And it would have been an immense coincidence for the tumors to suddenly bleed at around the same time when you would expect the brain shearing from blunt force trauma.  Similarly, it would have been a bizarre coincidence for Mr. Connor to lose mobility for any reason other than the brain bleed.  But it would not require a coincidence for the pulmonary embolism to have resulted from the cancer alone.

In sum, the Court is not concluding that the cancer independently caused the pulmonary embolism; but there is reason to believe the cancer could have.  The Court cannot conclude beyond a reasonable doubt that the cancer alone would not have caused the pulmonary embolism.

In light of this conclusion, the Court need not address whether the Government proved proximate cause and the other elements of Count I.

## **CONCLUSION**

This was not an easy decision, and if the burden of proof were lower than it is, the outcome could have been a different one.  Nonetheless, the Court finds Defendant NOT GUILTY of Count 1 and GUILTY of Count 2.

Pursuant to *United States v. Garcia*, 340 F.3d 1013, 1015 n.2 (9th Cir. 2003), the Court will permit Defendant to remain out of custody pending sentencing because there are exceptional circumstances justifying his continued release. Such exceptional circumstances include his age, medical conditions, and performance while on pretrial release. The Court also does not view Defendant as a current risk of flight or to public safety. He is ordered to remain on the current conditions of pretrial supervision and is warned that failure to abide by those conditions could result in his arrest and will be taken into account at sentencing.

Sentencing is scheduled for September 26, 2022 at 2:15 p.m.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, June 3, 2022.



Jill A. Otake
United States District Judge

CR. NO. 19-00113 JAO, *United States v. McAvay*; Findings of Fact and Conclusions of Law